

Sealed

Public and unofficial staff access to this instrument are prohibited by court order.

**United States Courts**
**Southern District of Texas**
FILED

APR 1 4 2016

David J. Bradley, Clerk of Court

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| VS.                       § | CRIMINAL NO. H **16 CR 0 147** |
| §                         | |
| SHAWN THOMAS POTTS        § | (UNDER SEAL) |
| ROBERT STANLEY CORBITT    § | |

## INDICTMENT

### INTRODUCTION

At all times material to this indictment:

1.      Chevron Corporation, its various subsidiaries, divisions, and related entities (collectively, "Chevron") was a major international integrated energy company involved in all aspects of oil exploration, production, refining, trading, and marketing.

2.      Oil trading is the process by which market participants buy and sell crude oil and related petroleum products, such as naphtha, vacuum gas oil ("VGO"), and fuel oil.   Oil traders may conduct purely financial transactions, or they may take actual physical possession of the traded product and provide for storage and shipment.

3.      Defendant Shawn Thomas Potts ("POTTS") was at various times a resident of New Jersey, Pennsylvania, and London, England.   He was an engineer and was employed by Chevron as an oil trader, buying and selling petroleum

products on behalf of Chevron.

4.     Calypso International Industries (Cayman) Ltd. ("Calypso Cayman") was a Cayman Islands corporation controlled by POTTS that held a bank account at First Caribbean International Bank in the Cayman Islands.

5.     Calypso International Industries Ltd. B.V.I ("Calypso BVI") was a British Virgin Islands corporation controlled by POTTS that held a bank account at BNP Paribas in Switzerland.

6.     Defendant Robert Stanley Corbitt ("CORBITT") was a resident of Houston, Texas who worked in the oil industry as an engineer, consultant, and oil trader.

7.     SCAT Ltd. ("SCAT") was a Cayman Islands corporation controlled by CORBITT that held a bank account at First Caribbean International Bank in the Cayman Islands.

8.     "Partnership A" was a partnership based in Houston, Texas that was involved in oil trading, oil refining, and related businesses.

9.     "Businessman 1" was a resident of Houston, Texas and was the general partner of Partnership A.

10.    "Businessman 2" was a resident of Houston, Texas and was a partner of Partnership A.

11.    Company B and its subsidiary (collectively, "Company B") was a Cayman Islands corporation headquartered in Houston, Texas.   Through its

subsidiary, Company B conducted oil trading in Houston and in London, England.

12.    "Businessman 3" was a resident of Houston, Texas and New Jersey and was employed by Company B as an oil trader.

13.    "Businessman 4" was a resident of London, England and was employed by Company B.   He worked in operations, finance, and oil trading.

14.    Tuscan Petroleum AG, a corporation based in Switzerland, and Tuscan Petroleum SARL, a corporation based in Monaco (collectively, "Tuscan"), were formed by and controlled by Businessmen 3 and 4 and were involved in oil trading. Businessman 3 worked at Tuscan's Houston offices.   Businessman 4 primarily worked at Tuscan's London, England and Zug, Switzerland offices.

15.    Fossil Energy Resources Ltd. ("Fossil"), incorporated in the British Virgin Islands, maintained a bank account at UBS in Switzerland and was controlled by Businessmen 3 and 4.

16.    Gullwing Shipping Ltd. ("Gullwing") was a corporation controlled by Businessmen 3 and 4 that maintained a bank account at UBS in Switzerland.

17.    BNK (UK) Ltd. ("BNK") was an entity that marketed petroleum products produced in Belarus.

18.    Intermarc BV ("Intermarc") was a corporation of the Netherlands that was involved in oil trading.

19.    Grace Industrial Group ("Grace") was an entity that marketed petroleum products produced in Russia.

20.     Valero Marketing and Supply Company ("Valero") was an oil company with offices in Texas.

## COUNT ONE
### (Conspiracy to Commit Wire Fraud - 18 U.S.C. § 1349)

**A.     INTRODUCTION**

21.     The Grand Jury adopts, realleges, and incorporates herein the Introduction section of the Indictment as if set out fully herein.

**B.     THE CONSPIRACY AND ITS OBJECTS**

22.     From in or about 2004, and continuing until on or about January 22, 2012, in the Houston Division of the Southern District of Texas and elsewhere, the defendants,

**SHAWN THOMAS POTTS and
ROBERT STANLEY CORBITT,**

did knowingly combine, conspire, confederate and agree with each other and with others known and unknown to the Grand Jury, including Businessmen 1, 2, 3, and 4, to commit the following offense:

(a)  to devise and intend to devise a scheme and artifice to defraud and deprive Chevron of the intangible right of honest services of its employee SHAWN THOMAS POTTS, and transmitting and causing to be transmitted certain wire communications in interstate and foreign commerce, for the purpose of

executing the scheme, in violation of Title 18, United States Code, Sections 1343 and 1346;

(b) to devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, knowing that they were false and fraudulent when made, and transmitting and causing to be transmitted certain wire communications in interstate and foreign commerce, for the purpose of executing the scheme, in violation of Title 18, United States Code, Section 1343.

## C.   MANNER AND MEANS OF THE CONSPIRACY

It was a part of the conspiracy that:

23.   While employed as a Chevron oil trader, POTTS steered Chevron business to particular counterparties to Chevron transactions that were willing to pay him kickbacks.

24.   CORBITT, who worked as a consultant to counterparties on Chevron transactions, obtained kickbacks on transactions involving POTTS, and he funneled certain kickback payments to POTTS through CORBITT's offshore account.

25.   Throughout the time period of the conspiracy, POTTS, CORBITT, and their coconspirators took steps to conceal the kickback scheme from POTT's employer Chevron and from others by not disclosing that POTTS was obtaining

personal compensation from counterparties on Chevron transactions; by using foreign entities and nominees to hold foreign bank accounts to receive, hold, and transfer kickback funds; by submitting false invoices to disguise kickback payments as legitimate fees for service; by filing false tax returns that omitted kickback income and that falsely claimed no interest in foreign bank accounts; and by receiving kickback funds in cash or by causing money to be wired directly from foreign nominee accounts to other individuals and entities.

**Partnership A Kickbacks**

26.     Partnership A and its partners were long-time Chevron business associates who purchased naphtha from Chevron and conducted other business with Chevron until their relationship with Chevron soured.

27.     Despite the changed business relationship, Partnership A was able to continue purchasing Chevron naphtha through an intermediary, known in the oil industry as a "sleeve."

28.     In return for the continuing Chevron naphtha sales, POTTS demanded kickbacks from Businessmen 1 and 2 at Partnership A.

29.     Partnership A placed POTTS and his family members on salary and made payments to POTTS' Calypso Cayman and Calypso BVI accounts.

30.     In order to disguise some of the kickback payments, POTTS submitted fictitious invoices to Partnership A from Calypso Cayman and Calypso BVI.

## Company B Kickbacks

31.     As a Chevron oil trader, POTTS, with the assistance of CORBITT and Businessmen 3 and 4, sold VGO to Company B, which Company B then immediately resold to third parties for a profit.

32.     CORBITT, who was already receiving a consulting fee from Company B, submitted invoices from his company SCAT to Company B for a substantial portion of the profits on the VGO sales.

33.     Company B sent payment on the SCAT invoices to CORBITT's SCAT Cayman Islands account, from which CORBITT subsequently paid kickbacks to POTTS through POTTS' Calypso Cayman account.

## Tuscan Kickbacks

34.     Through Tuscan, Businessmen 3 and 4 procured VGO from Cameroon and Belarus and fuel oil from Russia and sold it to Chevron through POTTS.

35.     Through Tuscan, Businessmen 3 and 4 also financed Intermarc's purchase of VGO from Belarus, which was then sold to Chevron through POTTS.

36.     In addition, through Tuscan, Businessmen 3 and 4 purchased fuel oil from Chevron through POTTS and resold it to Valero.

37.     POTTS provided Businessmen 3 and 4 with inside information from Chevron on pricing to facilitate the ability of Tuscan to complete sales with Chevron.

38.     After Tuscan was paid on transactions involving Chevron and others,

Businessman 4 made notations in running ledgers that he maintained for POTTS and CORBITT, reflecting their respective kickback balances.

39.     POTTS and CORBITT from time to time directed Businessman 4 to distribute kickback funds to them by delivering the money in cash and by wiring money from Businessman 4's Fossil, Gullwing, Tuscan, or other accounts in Switzerland directly to an investment account or to car dealerships and other entities in order to make investments and purchases on POTTS and CORBITT's behalf.

## D.     ACTS IN FURTHERANCE OF THE CONSPIRACY

40.     In furtherance of the conspiracy, and to effect the objects of the conspiracy, the following acts, among others, were committed in the Southern District of Texas and elsewhere.

### Acts Related to Partnership A Kickbacks

41.     On or about August 15, 2006, in invoice number 661 POTTS billed Partnership A $25,000 from Calypso BVI for "Installment Payment #1 - BioFuels Consulting Services."

42.     On or about August 25, 2006, in invoice number 1551 POTTS billed Partnership A $40,000 from Calypso Cayman for "Installment Payment #1 - Engineering Services."

43.     On or about September 4, 2006, in invoice number 666 POTTS billed Partnership A $50,000 from Calypso BVI for "Installment Payment #2 - BioFuels Consulting Services."

8

44. On or about September 5, 2006, in invoice number 1556 POTTS billed Partnership A $35,000 from Calypso Cayman for "Tank Field Surveying, Drainage Design, & Secondary Containment Design."

45. On or about September 11, 2006, in invoice number 1561 POTTS billed Partnership A $45,000 from Calypso Cayman for "Environmental Study, Ground Water Survey, Contaminat on Evaluation."

46. On or about September 12, 2006, in invoice number 671 POTTS billed Partnership A $55,000 from Calypso BVI for "Installment Payment #1 - Feedstocks Evaluation and Process Engineering Study."

47. On or about September 20, 2006, in invoice number 676 POTTS billed Partnership A $80,000 from Calypso BVI for "Engineering Services - Tank Design, Site Layout Piping, Iso's, Stress Analysis."

48. On or about September 21, 2006, in invoice number 1566 POTTS billed Partnership A $70,000 from Calypso Cayman for "Plant utilities engineering & design – Telecommunications, Electrical, Controls & Gauging, Water, Plant Air & Nitrogen Systems."

49. On or about October 4, 2006, in invoice number 681 POTTS billed Partnership A $75,000 from Calypso BVI for "Installment Payment #3 – BioFuels Consulting Services."

50. On or about October 5, 2006, in invoice number 1571 POTTS billed Partnership A $75,000 from Calypso Cayman for "Installment Payment #2 –

Engineering Services."

51. On or about October 10, 2006, in invoice number 686 POTTS billed Partnership A $50,000 from Calypso BVI for "Installment Payment #2 – Feedstocks Evaluation and Process Engineering Study."

52. On or about October 31, 2006, in invoice number 691 POTTS billed Partnership A $65,000 from Calypso BVI for "Installment Payment #1 – Boiler System, Thermal Oil System, & Vapor Recovery Designs."

53. On or about November 1, 2006, in invoice number 1576 POTTS billed Partnership A $35,000 from Calypso Cayman for "Installment Payment #1 – Barge Dock Engineering Study."

54. On or about November 13, 2006, in invoice number 1581 POTTS billed Partnership A $55,000 from Calypso Cayman for "Installment Payment #2 – Barge Dock Engineering Study."

55. On or about November 15, 2006, in invoice number 696 POTTS billed Partnership A $45,000 from Calypso BVI for "Installment Payment #2 – Boiler System, Thermal Oil System, & Vapor Recovery Designs."

56. On or about November 17, 2006, in invoice number 701 POTTS billed Partnership A $85,000 from Calypso BVI for "Engineering Services – Tank Stress Analysis, Roof Design, and Appurtenance Design."

57. On or about November 21, 2006, in invoice number 1586 POTTS billed Partnership A $55,000 from Calypso Cayman for "Civil Engineering Services

– Rail Siding and Loading Rack, Truck Driveway and Loading Rack, Biodiesel Plant Enclosure, Power Distribution Structures."

58.    On or about June 29, 2007, Partnership A placed POTTS and his mother on payroll and began paying them each salaries.

## Acts Related to Company B Kickbacks

59.    On or about July 20, 2006, Chevron through POTTS sold approximately 150,000 barrels of VGO to Company B.

60.    On or about August 10, 2006, Chevron through POTTS sold approximately 215,000 barrels of VGO to Company B.

61.    On or about September 4, 2006, CORBITT through SCAT paid POTTS through Calypso Cayman approximately $240,000.

62.    On or about September 15, 2006, CORBITT through SCAT paid POTTS through Calypso Cayman approximately $100,000.

63.    On or about October 11, 2006, Chevron through POTTS sold approximately 100,000 barrels of VGO to Company B.

64.    On or about October 16, 2006, CORBITT through SCAT paid POTTS through Calypso Cayman approximately $182,560.

65.    On or about October 30, 2006, CORBITT through SCAT paid POTTS through Calypso Cayman approximately $279,286.

66.    On or about December 28, 2006, CORBITT through SCAT paid POTTS through Calypso Cayman approximately $40,000.

67.    On or about April 9, 2007, Chevron through POTTS sold approximately 110,000 barrels of VGO to Company B.

68.    On or about April 27  2007, CORBITT through SCAT paid POTTS through Calypso Cayman approximately $61,573.

69.    On or about May 3, 2007, Chevron through POTTS sold approximately 180,000 barrels of VGO to Company B.

70.    On or about May 21, 2007, Chevron through POTTS sold approximately 84,000 barrels of VGO to Company B.

71.    On or about May 24, 2007, CORBITT through SCAT paid POTTS through Calypso Cayman approximately $103,099.70.

72.    On or about June 12, 2007, CORBITT through SCAT paid POTTS through Calypso Cayman approximately $90,218.

73.    On or about June 21, 2007, CORBITT through SCAT paid POTTS through Calypso Cayman approximately $98,876.

### Acts Related to Tuscan Kickbacks –
### VGO Purchased by Tuscan from Cameroon

74.    On or about March 24, 2009, Chevron through POTTS purchased approximately 40,000 metric tons of VGO from Tuscan.

75.    On or about May 19, 2009, Businessman 4 notated on the kickback ledger he maintained for POTTS: "Incoming $64,873.90" for "VGO Cargo."

76.    On or about May 19, 2009, Businessman 4 notated on the kickback

ledger he maintained for CORBITT: "Funds In $27,803.09" for "30 Pct VGO Sale."

77.     On or about June 23, 2009, Chevron through POTTS purchased approximately 40,000 metric tons of VGO from Tuscan.

78.     On or about August 4, 2009, Businessman 4 notated on the kickback ledger he maintained for POTTS: "Incoming $136,230.15" for "VGO Cargo."

79.     On or about August 4, 2009, Businessman 4 notated on the kickback ledger he maintained for CORBITT: "Funds In $58,384.35" for "30 Pct VGO Sale."

80.     On or about September 17, 2009, Chevron through POTTS purchased approximately 40,000 metric tons of VGO from Tuscan.

81.     On or about November 13, 2009, Businessman 4 notated on the kickback ledger he maintained for POTTS: "Incoming $176,032.50" for "VGO Cargo."

82.     On or about November 13, 2009, Businessman 4 notated on the kickback ledger he maintained for CORBITT: "Funds In $75,442.50" for "30 Pct VGO Sale."

83.     On or about April 23, 2010, Chevron through POTTS purchased approximately 40,000 metric tons of VGO from Tuscan.

84.     On or about May 27, 2010, Businessman 4 notated on the kickback ledger he maintained for POTTS: "Incoming $286,443.25" for "VGO Cargo."

85.     On or about July 2, 2010, Chevron through POTTS purchased approximately 40,000 metric tons of VGO from Tuscan.

86. On or about October 15, 2010, Chevron through POTTS purchased approximately 40,000 metric tons of VGO from Tuscan using the vessel "Pink Coral."

87. On or about November 8, 2010, Businessman 4 notated on the kickback ledger he maintained for POTTS: "Incoming $135,884.52" for "Pink Coral VGO."

### Acts Related to Tuscan Kickbacks –
### VGO Purchased by Intermarc from Belarus and Financed by Tuscan

88. On or about July 13, 2010, Chevron through POTTS purchased approximately 6,000 metric tons of VGO from Intermarc that was obtained from BNK and financed by Tuscan.

89. On or about August 11 2010, Chevron through POTTS purchased approximately 3,350 metric tons of VGO from Intermarc that was obtained from BNK and financed by Tuscan.

90. On or about August 12, 2010, Businessman 4 notated on the kickback ledger he maintained for POTTS: "Incoming $10,000" for "First BNK via Intermark."

91. On or about September 15, 2010, Businessman 4 notated on the kickback ledger he maintained for POTTS: "Incoming $5,112.00" for "Intermark 2nd Financing."

### Acts Related to Tuscan Kickbacks –
### VGO Purchased By Tuscan Directly from Belarus

92. On or about August 10, 2010, Chevron through POTTS purchased

14

approximately 5,500 metric tons of VGO from Tuscan, which had purchased the VGO directly from BNK.

93.     On or about September 1, 2010, Chevron through POTTS purchased approximately 2,945 metric tons of VGO from Tuscan, which had purchased the VGO directly from BNK.

94.     On or about September 20, 2010, Businessman 4 notated on the kickback ledger he maintained for POTTS: "Incoming $17,970.00" for "BNK First direct."

95.     On or about September 27, 2010, Chevron through POTTS purchased approximately 6,500 metric tons of VGO from Tuscan, which had purchased the VGO directly from BNK.

96.     In or about October, 2010, Tuscan obtained additional cargoes of approximately 3,700, 5,400, and 650 metric tons of VGO from BNK.

97.     On or about October 11, 2010, Businessman 4 notated on the kickback ledger he maintained for POTTS: "Incoming $9,157.48" for "BNK Direct 2,945 MT."

98.     On or about November 10, 2010, Businessman 4 notated on the kickback ledger he maintained for POTTS: "Incoming $32,814.53" for "BNK 6500, 3700, 5400, 650."

**Acts Related to Tuscan Kickbacks –**
**Fuel Oil Purchased by Tuscan from Russia**

99.   On or about August 9, 2010, Chevron through POTTS purchased from Tuscan two cargoes of approximately 7,000 metric tons each of fuel oil, delivered by vessels "Besiktas Halland" and "Purple Gem," which was purchased by Tuscan from Grace.

100.   On or about August 25, 2010, Chevron through POTTS purchased four, with an option for five, cargoes of 7,000 metric tons each of fuel oil from Tuscan, which was purchased by Tuscan from Grace.

101.   On or about August 31, 2010, Businessman 4 notated on the kickback ledger he maintained for POTTS: "Incoming $60,900.93" for "Grace Halland / Purple Gem."

102.   On or about September 21, 2010, Chevron through POTTS purchased three, with an option for four, cargoes of approximately 7,000 metric tons each of fuel oil from Tuscan, which was purchased by Tuscan from Grace and was delivered in October 2010.

103.   On or about October 11, 2010, Businessman 4 notated on the kickback ledger he maintained for POTTS: "Incoming $155,105.26" for "Grace First term 5 Cargoes."

104.   On or about November 10, 2010, Businessman 4 notated on the kickback ledger he maintained for POTTS: "Incoming $167,504.78" for "Grace

October 3 + 1 Cargoes."

### Acts Related to Tuscan Kickbacks –
### Fuel Oil Sold by Tuscan to Valero

105.  On or about June 5, 2010, Chevron through POTTS sold 695,215.060 barrels of fuel oil to Tuscan, which Tuscan resold to Valero.

106.  On or about June 21, 2010, Businessman 4 notated on the kickback ledger he maintained for POTTS: "Incoming $288,328.32" for "Fuel Oil Valero."

### Acts Related to the Transfer of Kickback Funds
### for the Benefit of POTTS and CORBITT

107.  On or about April 1, 2010, Businessman 4 transferred approximately $45,922.39 to an individual or entity for the benefit of CORBITT.

108.  On or about October 15, 2010, Businessman 4 transferred approximately $37,000 to an individual or entity for the benefit of POTTS.

109.  On or about October 20, 2010, Businessman 4 transferred approximately $20,750 to an individual or entity for the benefit of POTTS.

110.  On or about October 20, 2010, Businessman 4 transferred approximately $37,500 to an individual or entity for the benefit of POTTS.

111.  On or about November 2, 2010, Businessman 4 transferred approximately $10,500 to an individual or entity for the benefit of POTTS.

112.  On or about November 30, 2010, Businessman 4 transferred approximately $11,500 to an individual or entity for the benefit of POTTS.

113.   On or about December 2, 2010, Businessman 4 transferred approximately $17,000 to an individual or entity for the benefit of POTTS.

## Acts Related to Misrepresentations on Tax Returns – Income and Foreign Accounts

114.   On or about October 15, 2007, CORBITT filed a false 2006 Form 1040 Individual Income Tax Return in that he did not declare income he obtained from kickbacks and misrepresented that he did not have an interest in foreign bank accounts.

115.   On or about October 16, 2007, POTTS filed a false 2006 Form 1040 Individual Income Tax Return in that he did not declare income he obtained from kickbacks and misrepresented that he did not have an interest in foreign bank accounts.

116.   On or about April 15, 2008, CORBITT filed a false 2007 Form 1040 Individual Income Tax Return in that he did not declare income he obtained from kickbacks and misrepresented that he did not have an interest in foreign bank accounts.

117.   On or about January 2, 2009, POTTS filed a false 2007 Form 1040 Individual Income Tax Return in that he did not declare income he obtained from kickbacks and misrepresented that he did not have an interest in foreign bank accounts.

118.   On or about March 6, 2010, CORBITT filed a false 2009 Form 1040

Individual Income Tax Return in that he did not declare income he obtained from kickbacks and misrepresented that he did not have an interest in foreign bank accounts.

119.   On or about April 12, 2011, POTTS filed a false 2009 Form 1040 Individual Income Tax Return in that he did not declare income he obtained from kickbacks and misrepresented that he did not have an interest in foreign bank accounts.

120.   On or about January 22, 2012, POTTS filed a false 2010 Form 1040 Individual Income Tax Return in that he did not declare income he obtained from kickbacks and misrepresented that he did not have an interest in foreign bank accounts.

All in violation of Title 18, United States Code, Section 1349.

## COUNT TWO
### (Conspiracy to Commit International Money Laundering – 18 U.S.C. § 1956(h))

**A.    INTRODUCTION**

121.   The Grand Jury adopts, realleges, and incorporates herein the Introduction section of the Indictment as if set out fully herein.

**B.    THE CONSPIRACY AND ITS OBJECT**

122.   From in or about 2004, and continuing until on or about January 12, 2012, in the Houston Division of the Southern District of Texas and elsewhere, the defendants,

**SHAWN THOMAS POTTS** and
**ROBERT STANLEY CORBITT,**

did knowingly and intentionally conspire, combine, confederate, and agree with

each other and with others, known and unknown to the Grand Jury, including

Businessmen 3 and 4, to commit offenses under Title 18, United States Code,

Section 1956, namely:

> (a) to transport, transmit, or transfer funds from a place in the United States
>
> to or through a place outside the United States, or to a place in the
>
> United States from or through a place outside the United States, with
>
> the intent to promote the carrying on of a specified unlawful activity,
>
> that is, wire fraud, in violation of Title 18, United States Code, Section
>
> 1956(a)(2)(A);
>
> (b) to transport, transmit, or transfer funds from a place in the United States
>
> to or through a place outside the United States, or to a place in the
>
> United States from or through a place outside the United States,
>
> knowing that the funds involved in the transmission or transfer
>
> represent the proceeds of some form of unlawful activity, and knowing
>
> that such transmission or transfer was designed in whole or in part to
>
> conceal and disguise the nature, location, source, ownership or control
>
> of the proceeds of specified unlawful activity, that is, wire fraud and

20

commercial bribery under Section 32.43 of the Texas Penal Code, in violation of Title 18, United States Code, Section 1956(a)(2)(B).

## C.   MANNER AND MEANS OF THE CONSPIRACY

It was a part of the conspiracy that:

123.   The Grand Jury adopts, realleges, and incorporates herein the manner and means allegations in Paragraphs Twenty-Three through Thirty-Nine of Count One as if set out fully herein.

124.   POTTS and CORBITT caused their kickback funds to be funneled into accounts in Switzerland that Businessman 4 maintained under the names Tuscan, Fossil, and Gullwing, among others, so that the funds would not be held in accounts in their own names or in corporate accounts that they had opened or directly controlled.

125.   On behalf of POTTS and CORBITT, Businessman 4 maintained running ledgers that tracked the deposit, disbursement, and balance of POTTS' and CORBITT's funds that Businessman 4 held in accounts in Switzerland.

126.   POTTS and CORBITT directed Businessman 4 to pay them their funds by wiring money from Businessman 4's accounts in Switzerland directly to car dealerships and other entities in the United States from which POTTS and CORBITT were making purchases.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNT THREE
### (Willfully Filing False Tax Return – 26 U.S.C. §7206(1))

127.   On or about March 6, 2010, in the Houston Division of the Southern

District of Texas and elsewhere,

### ROBERT STANLEY CORBITT,

defendant herein, did willfully make and subscribe a 2009 U.S. Individual Income

Tax Return, IRS Form 1040, which defendant verified by a written declaration that it

was made under the penalties of perjury; which defendant filed with the Internal

Revenue Service; and which defendant did not believe to be true and correct with

regard to every material matter in that defendant claimed on such return total income

in the amount of $196,827 (form 1040, line 22), whereas, as defendant then and

there well knew and believed, such claimed amount was false in a material amount,

and in that defendant claimed on such return that he did not at any time during 2009

have an interest in or a signature or other authority over a financial account in a

foreign country, such as a bank account, whereas, as defendant then and there well

knew and believed, during 2009 he had signature authority over at least three foreign

bank accounts, including two accounts at LGT Bank in Switzerland styled in the

name "Stooby" and an account at First Caribbean International Bank in the Cayman

Islands styled in the name "SCAT Ltd."

In violation of Title 26, United States Code, Section 7206(1).

## NOTICE OF FORFEITURE
### 18 U.S.C. §981(a)(1)(C) and 28 U.S.C. §2461

128.   Pursuant to Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 981(a)(1)(C), the United States gives notice that the defendants,

**SHAWN THOMAS POTTS** and
**ROBERT STANLEY CORBITT,**

that in the event of conviction of the offense charged in Count One of this Indictment, the United Sates intends to seek forfeiture of all property, real or personal, which constitutes or is derived from proceeds traceable to the Conspiracy to Commit Wire Fraud.

## NOTICE OF FORFEITURE
### 18 U.S.C. §982(a)(1)(A)

129.   Pursuant to Title 18, United States Code, Section 982(a)(1)(A), the United States gives notice to the defendants,

**SHAWN THOMAS POTTS** and
**ROBERT STANLEY CORBITT,**

that in the event of conviction of the Conspiracy to Commit International Money Laundering offense charged in Count Two of this Indictment, the United States

intends to seek forfeiture of all property, real and personal, involved in money laundering and all property traceable to such property.

## Money Judgment

130. Defendants are notified that upon conviction, a money judgment may be imposed equal to the total value of the property subject to forfeiture.

## Substitute Assets

131. Defendants are notified that in the event that property subject to forfeiture, as a result of any act or omission of the defendants,

(A) cannot be located upon the exercise of due diligence;

(B) has been transferred or sold to, or deposited with, a third party;

(C) has been placed beyond the jurisdiction of the court;

(D) has been substantially diminished in value; or

(E) has been commingled with other property which cannot be divided

without difficulty;

the United States will seek to forfeit any other property of the defendants up to the total value of the property subject to forfeiture, pursuant to Title 21, United States Code, Section 853(p), as incorporated by reference in Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 982(b)(1).

A TRUE BILL:

Original Signature on File

FOREPERSON OF THE GRAND JURY

KENNETH MAGIDSON
UNITED STATES ATTORNEY

By: _____

Robert S. Johnson
Assistant United States Attorney